The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Good morning, Your Honor. May it please the Court. My name is Carmen Hernandez and I represent Daniel McIntosh, who is serving a 10-year mandatory minimum after a jury trial, a lengthy allegation that he participated primarily in a marijuana conspiracy. At sentencing, the District Court told Mr. McIntosh that if he could, he would have sentenced him to a lower sentence, but he was bound by the mandatory minimum. The evidence in the case, there was no hard evidence against Mr. McIntosh in the sense that he had not been intercepted in any phone calls, he had not been observed or surveilled transferring marijuana, no marijuana was ever seized from any location that he controlled, either his home or his place of business. At trial, the jury acquitted him on half the counts and convicted him on the others. And I say that because the errors in the case were critical to the conviction. And I'm going to start with, I've raised a number of issues and I'm certain that I'm not going to get to all of them in oral argument. I don't mean to abandon any of them. The first argument I believe that I would like present is the 404B evidence. The District Court admitted 404B evidence, which is inconsistent with a line of cases by this court about the requirements for introduction of prior drug convictions in a drug conviction case. This court has made very clear that the fact that someone committed a drug conviction is either inadmissible under Rule 404B or relevant to any issue in a case. It has required... Well, with respect to the 404B evidence, the government makes the point that you put the question of intent to distribute in play. And I would imagine that in a marijuana drug distribution conspiracy, not always, but a lot of times the defendant would put the question of intention into play. His defense was not that he didn't know what the marijuana looked like or that he participated but did not intend to conspire. His defense was that he did not participate in this conspiracy. And in at least three cases, in Johnson, Hernandez, and McBride, this court has reversed convictions in drug cases where one could argue that in any case that goes to trial, the issue of intent is always at play. But in all three cases, the court required a sufficient nexus in time, manner, place, and pattern of conduct. That's this court's language in McBride. And that was not present here. There were two sets of prior convictions. In 1998, Mr. McIntosh had been convicted in Pennsylvania in a sting operation, relatively small quantity of marijuana. His conduct, although this conspiracy was alleged to have gone on for over 10 years, the only conduct of which any evidence was presented was in or about 2008. There was some reference maybe to before 2008 and 2007, but 2008 was the bulk of the evidence against him. So that the 1998 convictions had no relationship. This court has reversed a case in Johnson. This court found that five years was too long a period in Hernandez. This court found that six months was too long a period between the prior and the current where there was no relationship between those persons. In other words, none of the people involved in the 1998 convictions were in any way alleged to have participated in this, in the instant conspiracy. Why doesn't that go to wait rather than admissibility? That's not what this court found in McBride, in Johnson. Well, in many instances we've made the point that the whole question of the relevance of a 404B evidence is not always a question of admissibility, that it's open to cross-examination and that the jury can assign what weight it wishes to or what weight it doesn't wish. And we have made that point that it can be a matter of wait for the jury to consider. Well, I don't believe that the court addressed weight at all in those three cases, which are three drug cases where the court has been very clear. They started, Hernandez is a 1992 case, Johnson is a 2010 case, McBride is a 2012 case. At no time did the court mention, let it in and we'll look at weight. As far as that question, however, the second conviction that was introduced was one in 2004 in Baltimore County. During the time of the conspiracy, 2004 was within the conspiracy. Correct. But what's significant in that situation is that the court and the government, while the government introduced a transcript of the 1998 Pennsylvania conviction and brought in the arresting officer from the 1998 conviction, it only introduced the fact of the conviction in the 2004 Baltimore County conviction. And the court precluded cross-examination and about the reasons why, about the background of that case. So there was no, if 404B is supposed to have some relevance, the fact of conviction is not relevant in terms of evidence. If all you introduce is the fact of conviction, what you're doing is propensity evidence in my opinion, Your Honor. What about the Baltimore conviction though? The conspiracy was, I mean the instant offense related to drug activity out of Baltimore and the priors involved marijuana and the same place, same drug, same place. As Judge Thacker points out, the Baltimore conviction was within the time of the conspiracy. I'm sorry, the Baltimore conviction was for grams of marijuana found in his person when the police went to arrest him on a complaint by the mother of his child who had a custody dispute. None of that was introduced. I it was objected. So the Baltimore, as far as relevancy for a conspiracy to distribute, the fact that he had a tiny amount of marijuana, the information that was introduced did not involve any discussion of the quantity of marijuana that was found on him. What about the fact that the, I mean I get your point, this seems like a pretty close issue on the merits, but what about the fact that the government didn't really spend a lot of time talking about these convictions in its closing argument? Every witness that I put on, every character witness that I put on, and we put on a lot of character witnesses because this gentleman had a viable, thriving music club running. It was not making a lot of money because it's a type of business that has a very thin line of profit, but it was vibrant. There were, we over the period of, I mean, external records, records from a ticket company, an internet ticket company. We brought in computer records that showed the vibrancy. We brought in- But the larger point is, I mean, I don't expect you to agree with what I'm about to say. I would be shocked. But there was a lot of evidence brought into this case about Mr. McIntosh saying that I wasn't involved in the conspiracy, but on the other hand, you had a number of witnesses that testified to an extensive involvement in 2000. Hold on for just a second. Yes, sir. I appreciate your eagerness to present your case. You're doing a great job of it, but there were a number of witnesses that testified to McIntosh's extensive involvement in the conspiracy in 2008, 2009, and he is, you know, he's denying involvement in the conspiracy, but on the other hand, you know, there's got to be a role for the jury involved in that, and in particular, the witnesses testified to the fact that McIntosh was not only involved himself, but he brought others into the conspiracy, or at least he brought Mr. Parker into the conspiracy. There was also testimony that he received payments from Mr. Nika for the marijuana that his recruit, Parker, had transported, and that he was not just involved in the conspiracy, but he was utilizing employees from Sonar in the conspiracy and other members of the conspiracy to deliver marijuana on his behalf and collect the So it seems to me from the accumulation of the testimony that this was a pretty strong case against your client, or at least if it's not a strong case, it's a question of credibility as to whether the witnesses, whether the jury did or did not believe the witnesses. You were correct. I disagree. You're not going to agree with me. I always tell juries, so I might as well tell the court, that I grew up in New York City, so... I couldn't tell. I think it's a trifecta. I grew up in New York City. By the way, growing up in New York City is a huge plus for Judge Diaz and myself. I moved when I was two, but Judge Diaz has reminded everyone that I'm a New Yorker by birth. Excuse me, I didn't mean to interrupt you. We can have a party about New York City. At this point in my career, I think I just speak my mind, and the third aspect of it, I was born in Cuba, so that just, the combination of those three things, just, so if I overstep the line, Your Honor, I apologize. You haven't at all. You go ahead. I interrupted you, and I want to make sure I hear your answer. Your Honor, I disagree. About how strong a case this was. I disagree completely. There were the two worst witnesses in my entire career. One witness, and this goes to one of the errors, one witness took the stand, and the court, he was nodding. He was, we the defense believed that he was high on heroin, and in fact, there was a drug test taken of him the second day of his testimony when he entered the community facility, and it was dirty. And the jury could observe all that for themselves and decide whether to credit that witness. Well, it rejected a lot of his testimony, because had it believed his testimony, Mr. McIntosh would have been convicted of every offense. He's the quote unquote employee that Mr. McIntosh used. By his own admission, I agree, Your Honor, in my opinion, they shouldn't have believed a thing he said. But by his own admission, he was a multi-drug user. He had used, during the period after which he was testifying, he claimed to have been using heroin. Let's talk about what the court did with respect to Mr. Lloyd. The court invited you, Mr. McIntosh, to recall Lloyd to the stand and question him about his drug use, but you did not do that. The court would have stated at the same time that the only way I could introduce evidence of the drug test is if I brought in a drug expert to explain it.  This was the end of, I needed, in order to do that, I needed to obtain approval from the court to hire an expert. By the way, I had requested an expert. But that gets into a side trial, if we're going to have an entire hearing and trial on Mr. Lloyd's drug habits and have expert testimony on Mr. Lloyd's drug habits. As Judge Thacker points out, the testimony that Mr. Lloyd was observable and the coherence of his testimony, all the lack thereof, was observable to the jury. And you had a chance to ask Mr. Lloyd about his drug use. The government's theory of the case was that he was asleep and they questioned him, that he was sleeping. They questioned him about it. And his testimony is he had been so worried about testimony that he had stayed up all night. They interrupted his testimony that first day and asked the court to let him, the court said, sure, go home and sleep. And the government said, we don't think he's, we think he would be a danger to society if he gets on the road because he's so sleepy.  That would have been a wonderful opportunity for you to just discredit him in a number of ways, wasn't it? The court's theory, the government's theory was that he was sleepy and the courts accepted that. The only thing that was undisputed is that the guy was naughty and he had a history of drug use and there were only two witnesses, Your Honor, who put my client in the middle of this. The other witness was a man who was put before the grand jury three times to clarify his previous testimony. We believe he perjured himself. By his own admission, he paid money to a number of the co-conspirators, paid their attorney's fees. After the conspiracy got busted because of a seizure of drugs, he, on directions from the number one guy who was on the lam and has since just recently been arrested, he destroyed evidence. He told a witness to lie before the grand jury and he... And did you cross-examine him on all of that? Yes. Okay. Obviously, I'm not as good a lawyer as I believed I was. But, but... Ms. Hernandez, you mentioned with respect to the 404B evidence, I think you were going to tell me that you had a number of character witnesses who testified and they were impeached. Is that what you're saying? Yes, sir. But that would have happened anyway, right? Well, but the judge indicated that... The reason I answered that is because Judge Wilkinson indicated that it really didn't play a part in the case, the 404B. But that wasn't a 404B issue at that point. If they were coming in as character witnesses, they could be impeached with respect to specific instances of conduct of your client. They were coming in... We limited their testimony so that it wouldn't have been... It wouldn't be a big deal. But I see that my light is red. No, because I interrupted you and I want you to have some extra time. Thank you, Your Honor. They were impeached... The government knocked the fact that he had these prior convictions at every witness throughout the case. And I believe it tainted the story. Otherwise, Mr. McIntosh is a businessman with 20 witnesses that we presented, performers, people who had invested with him, some of the government witnesses, no hard evidence, and these two people who... How long did this trial last? It lasted eight weeks, but part of the reason... It lasted how long? Eight weeks? Yes, but part of... I wouldn't say we had eight weeks of trial. There were a lot of days off because Judge Titus was out of town and there was an out of town attorney and all sorts of things. That's not unusual. But that's a long trial, though. It was a long trial. I know you've given me more time. I want to say something else about the 404B evidence. The government never gave notice and they have hit on one statement in argument in the middle of trial where either I misspoke or the transcript is incorrect. And I referenced that the government first noticed the 404B on August 1st. In fact, that was a reference to October 1st, the day the government files a pleading. And nowhere in the record is there a letter, an email, or a filing on August 1st given 404B notice. It's a violation of the discovery agreement, which should be enforceable because we waived our right to file motions. The government did not exempt for itself generally that it could delay production. And that created a big problem because as a result of that, we were unable to investigate the... I was unable to investigate the particulars of the Baltimore... The government contends that it gave you notice of the prior convictions two weeks prior to trial. That's where they're hitting on this statement that I made during oral argument in front of the judge in October, a month after the case is started. But it's a mistake. That reference... And it's all set out in my motion at the time, October 4th motion that I filed. That reference should be to October 1st. That's the only pleading in the record by the government where it actually gives notice. Before then, it has the standard... Normally, a discovery agreement would provide... Normally, defense seeks in a discovery agreement a period in which the government must provide notice. But the discovery agreement stipulate a period? The discovery agreement state stipulates, and it's in the record. The government introduced it in its supplemental appendix. The discovery agreement states, as soon as you sign the agreement, we will start to provide 404B. And they didn't. That agreement was in 2011. The trial started in... But you had it... You agree that you had it two weeks before the beginning of... No. That's... The only way I have it two weeks is if that statement that I made when we were arguing for justice about the timeliness, where... I don't know if I made it or whether there's an error in the track. There's a reference to... On August 1st, the government gave notice. There is no document. There's no email. There's no filing report. But did they give you notice of the convictions or not? They say they did. Two weeks. On August 26th, I believe, they sent a letter saying we reserved the right. And a couple of days before trial began, they sent a packet of the Pennsylvania 2008 convictions, not saying this is 404B. They emailed. Well, but that's what it would be. Well, that's when I file a motion saying... Motion to exclude 404B, although I don't know the... What did the August 26th letter say? We reserved the right to what? To present 404B. But they never identify the purpose or what the evidence is. It's just a line in a discovery letter. It wasn't a 404B letter. It was just a... You know, we're producing this... It didn't say the 1998 conviction and the 2005. Correct. And that letter is in the supplemental appendix that the government filed. I've gone way before, Your Honor. Thank you. Thank you. Ms. Ralston, when you have a chance, we're happy to hear from you. Good morning, Your Honors. May it please the Court, Sonia Ralston for the United States. And I'd like to start where we left off with this notice issue. It's in the government supplemental appendix. There's a letter dated August 26th, which was two and a half weeks before the trial began, at the government supplemental appendix, page 30, where it says, as a reminder, the government may introduce evidence of your client's prior convictions pursuant to Rule 404B. The prior notice, the August 1st notice, was that a NCIC report, a criminal history report, had been provided to the defendant. That's what the record reflects. And whether there's an error... August 1st, you're saying the government provided the NCIC criminal history report? Yes. And then on August 26th, that's what you said, as a reminder, we're going to... Right. And that's a reference to the discovery agreement, which previously had said, in the discovery agreement, the government reserved the right to introduce any prior conviction. And you had given them the listing of prior convictions, August 1st? That's as far as... That's what the record reflects. If there was an error in the record somehow, that would have been counsel's obligation to correct that before this point. And from the NCIC report, you can see what all the convictions are. It doesn't have all the details in it, but that was... At that point, the government was still gathering the information. The police reports were turned over September 10th, which is at GSA 31, and they're not introduced until the very last day of the case in chief, which is in October. So it's a month later that this gets around to being litigated in front of the district court. But I do have a question about the 1998 conviction. How is it relevant when it's not within the time of the conspiracy? It's not the same place. It's not the same people. It's not anything like this other than to prejudice the defendant. So the key in determining 404B is the level of similarity. And Your Honor has pointed out... Right. I know the key to determining 404B. And there's no similarities here other than this defendant and marijuana. So what's the point other than to make the jury think, well, he did it once, so he must have done it again, which that you cannot do. That's correct, Your Honor. I have two responses. Okay. The first is that although you've pointed out several things that can be considered with similarity, McBride points out four others, and those are all in the government's favor here. So that is the type of drug, the action involved, the amount, whether it's a, for example, personal use amount or distribution quantity, and the method involved. So here where it's marijuana in both cases, it's distribution in both cases. It's not possession or manufacture. The amount is a large quantity in both cases. In the Pennsylvania case, it's 15 pounds. That's not some piddling amount. That's a very large amount of marijuana. And in both cases, we're dealing with the method of importing marijuana, using a courier to go across state lines to import marijuana to bring it back to the same place, to Baltimore. And that's in contrast to, for example, in Hernandez, where this court said, you know, in one case, she's talking about a recipe for cooking crack cocaine in New York, and in the other case, she's charged with a hand-to-hand transaction of powder cocaine in Washington, D.C. And so it uses those, you know, place and type of drug and type of action to distinguish them. So there are similarities here. I grant you this is not a slam-dunk case, but it's in the district court's discretion to make these calls. The review at this point is for abusive discretion. And the district court put findings on the record where it found that this goes to show his distributive intent. And I want to go to the point of whether his intent was at issue, because it was. He didn't deny knowing or being involved with the co-conspirators. He acknowledged that he knew Lloyd, that he knew Sharpetta, that he knew Parker. And the question was whether his involvement with these gentlemen, you know, he acknowledged that he provided Lloyd and Parker a place to live, for example. The question was whether his involvement with them was completely innocent, like he claimed, or whether he was part of the drug conspiracy that they were involved in. And so at that point, his intent in those relationships was at issue. So this isn't a case where, for example, in Hernandez, where it's an alibi defense, and he says, I was out of town when this happened. That's not what's going on here. He's not saying, I have no idea who these guys are. They're just framing me. He's saying, yeah, I know them, but they might have been involved in that, but I wasn't. And how is the jury to evaluate the credibility of that defense? And that's where these prior convictions are relevant. And in Queen, which is, I think, this Court's strongest case on the background, the purposes of the rule of 404B, it talks about the doctrine of chances. And it contrasts this type of minor inductive reasoning from conduct, that you do something over and over and over, it becomes less likely that the next time it's an accident, that's the doctrine of chances, from character reasoning, which is a much more general version of inductive reasoning, that you did something bad, therefore you're a bad person, therefore you do bad things again. And that's not what was going on here. This was much closer to the first version because of the similarities that I outlined. So Judge Diaz brought up the point that you didn't make a lot of that in your closing argument, in any event, with the Pennsylvania convictions. So what about just the overall strength of your case? I mean, an eight-week trial, a lot of people put in a lot of effort, and a lot of evidence came in. Your opponent says this wasn't a strong case, that I think her words were, these were the two worst witnesses I've seen in my entire career, Lloyd and I forget the other person's name. Would you mind commenting on that, just sort of fundamental justice of what went on below? I'm interested in your assessment of the strength of your case, and what you thought would enable the jury to rule in your behalf. Absolutely, Your Honor. So this was a 25-day, there were 25 trial days spread over eight weeks. So it's a lengthy trial, even though they didn't meet every day. The prior conviction evidence here spans about 20 pages of the transcript. So it's a very limited part, and it's not... How long does the transcript go on? It's 2,200 pages or so. Pardon me if I didn't read everything. That's absolutely understandable. So it's talking about like 1% of the trial, the very small thing going on here. And the other evidence was very strong. So you have these five co-conspirators who testify, not just Lloyd and Sharpetta, but also Minshaw and Constantinides and Spain, who all testify very consistently about the details of how this conspiracy worked. And it went on for about nine years. So this is a big part of their lives for a very long period of time. And the details that they give about how the marijuana was imported, where they brought it to. It went on for nine years, huh? From 2001 to... There's a raid in 2009, but the indictments returned in 2011, and it extends the whole time. So between eight and 10 years, depending on exactly where you draw the cutoff. The... You know, their descriptions of the marijuana coming in packaged in exactly the same way, in these turkey basting bags and vacuum sealed and in the construction trash bags to conceal them and packed into crates, and who's there when they're unloading them. And then they take them to different stash houses, and they're using these phones with the single number to contact each other. The fact that their descriptions are all so consistent amongst them is corroborative. So you don't have to just take one individual witness's say-so for it and judge his credibility. You have all of them telling the same consistent story. That may establish the existence of the conspiracy, but what's the link to Macintosh? Your Honor, they, again, consistently recounting Macintosh being... All five witnesses? Joe Spain doesn't talk about Macintosh, but the other four do. So they're talking about Macintosh being present when money is counted, that he is present when drugs are unloaded off the trucks, that he, on each importation, is taking around 100 pounds for redistribution out to lower-level dealers, that he then gives some of that to Lloyd, who distributes it, who then brings the money back to him, and that he goes through these real estate transactions with Nika, who's the big boss, who just pleaded guilty a couple weeks ago, and that the real estate transactions to both conceal Nika's ownership of these properties, and then to kind of launder this one house, the 1207 Weldon House, into a place for Parker and Lloyd to kind of do their conspiratorial act. Just as far as I recall, he was the one that brought Parker into the conspiracy. That's absolutely correct. And he brought him in, and the boss, Nika, he got payments from Nika from the marijuana that Parker was transporting. That's correct. And that was another, so he was profiting, and then he was utilizing the employees from Sonar in the conspiracy. That was another instance of his involvement, and they were, the other members of the conspiracy were delivering marijuana on his behalf, collecting money, which went back to him. That's correct. And I think one of the other strongest pieces of evidence here is the testimony of Elizabeth Barr, who was a legitimate employee of McIntosh's at the Talking Head, which was another one of the clubs that he managed. And she's not involved in the conspiracy. She is, when she testified, she's in a PhD program in Wisconsin. She is a clean, credible witness, and she talks about this time, it's at pages 362 to 365 of the Joint Appendix, where she's at work. McIntosh calls her, says, come over to Sonar. I need you to do me a favor. She goes over, and he has a cargo van loaded up with marijuana and a guy there who she doesn't recognize, but who was supposed to drive the van and is way too drunk to drive it. So McIntosh tells her, put the guy in the van, drive the van out to this house, and drop him off there. So she does it, puts him in, drives him out there, and drops him off, and he takes all the marijuana into the house. And along the way, he throws up in the van, which then she has to clean up. So she has this very vivid memory, and her recall of it is, it's like you're there. How is this throwing up in the van, and I mean, how does that relate to McIntosh? It's because that's the reason she remembers it so clearly, because it's this very unusual event. And her testimony is essentially unimpeachable, and it's corroborative of everything else that's going on here. And that's another reason why the evidence, why anything that happened with this 404B evidence is harmless. They have a lot of sleepy, drugged, and nauseous witnesses in this case, it sounds like. It's, well, when there's this much marijuana involved. What about the attacks on these other two witnesses about their demeanor on the stand and that kind of thing? Is that simply a matter for the jury? That's absolutely a matter for the jury. As far as sufficiency goes, it's absolutely a matter for the jury. I think this court could consider it when you're looking at whether the evidence is so overwhelming to be harmless, but I think that's why the fact that all five witnesses are telling a very consistent story about the conspiracy kind of overtakes any doubts that one might have about their appearance or demeanor. And also, you have the district court giving his own view of Lloyd, where... If Mr. Lloyd was sleeping, was he actually sleeping on the stand? He was not sleeping on the stand. He was very tired. He had stayed up all night the night before, and he says sitting in his car by the side of the road, being anxious about testifying, he didn't want to testify. He was an unindicted co-conspirator, so he was not subject to a plea agreement at this point, and he... Did he have an immunity agreement? I think that he had an agreement, yes, that he wouldn't be prosecuted for this crime. He was obviously subject to other prosecutions. The defense was able to bring that out? Yes, Your Honor. And he's crossed at length. I mean, the cross-examination is, I think, to counsel's credit, extensive and well done. But you have, at JA 899, the district court's consideration of a motion to strike, where the district court says, I observed this witness. I found him to be responsive. I recognized that he was tired, and that's why I was happy to send him home early to get a good night's sleep. I do not believe this gentleman, while he may have been a drug user in the past, walked into this courtroom stoned and unable to comprehend the questions. So although, you know, credibility is obviously for the jury, you do have, on the record, the district court's analysis of his own observations of this witness. So that you don't have to, you know, just infer what the witness looked like from the record. You have the district court telling you. He actually was drugged, though, wasn't he? Didn't he test positive? He did, Your Honor, but two things. The first is that he admitted on the stand that he had used marijuana three weeks in advance. There was nothing, no evidence about how long, how sensitive this test was. And this is one of the reasons the district court excluded it, because there was some discussion at this sidebar that some tests can reach back four weeks, and so what he had already admitted on the stand could have been the result of the test. And also, on this point about the drug test, that the court didn't require the defendant to call an expert. It offered that she could have subpoenaed one of the employees from the prison facility, the jail, the county jail, who was responsible for the test and familiar with the test, to come in and explain how it was done and what it means and what it tests for. The court offered to issue that subpoena, and counsel demurred. So they talk about also the Baltimore conviction and wanting to get in the facts about that. And it was offered at page 2091 to 2092 that she could have called the police officer in her case in chief to talk about the details of that conviction, but obviously that would have been subject to cross-examination. And the cross-examination would bring out that it's not just 70 grams of marijuana that was found. There were grow lights and other distribution-type things found at the house. So that was an offer made to the defendant. It was something that he declined to do. So the reason those facts aren't in the record is because of him. I know a trial of this length is quite a trial management challenge for a district judge. I mean, these things come up all the time. You get jurors over an eight-week span, witnesses that don't show up. Some of them are not in the best of shape. Jurors have illnesses and ask to be excused or request for continuances here and there. It's a challenge. It certainly is. And I think the judge here did an excellent job trying to manage all of the interests and keep the trial moving. I don't have anything else unless the court has further questions. We ask that you affirm. Very fine. Thank you. We're happy to hear from you in rebuttal. Thank you, Your Honor. Your Honor, I recognize that government counsel was not trial counsel. And in my opinion, she's mischaracterizing the record. The court asked about the other witnesses. There was the other truck driver named Spain who had been asked by Sharpeta to lie before the grand jury. He did not know Mr. McIntosh, had never seen him, did not mention him. Constantinidis was a guy who was also a heroin addict, perjured himself. And when shown a picture of my client at trial, identified him and said he saw him once or twice. When shown a picture of my client pre-trial, he did not pick him out, misidentified him completely. Minshaw, who worked at Sonar, he was working with NICA throughout the first 10, 12 years and this was his third conviction. Minshaw worked for Mr. McIntosh at Sonar. Worked. I asked him on the stand, did you work? Did you actually work? What was this? Because he needed a job, couldn't find a job. He needed a job because he was on probation. He said, no, I worked and I got paid $10 an hour. I did handyman work. He never, Mr. McIntosh never asked him to do anything with drugs, never asked him to do anything with money, although he worked at Sonar. Did the district court cut short your cross-examination? Of Minshaw, no. You had a shot at each of these witnesses. But the recitation of the evidence was incorrect. Minshaw said he never was asked to do anything with drugs, never saw any drugs during the time period he worked at Sonar and which was right in the middle of the conspiracy. The only quote-unquote employee of Sonar who claimed to have worked delivering marijuana was this guy Lloyd. And it's true. The district court said, oh, he's sleepy. The district court cannot make that assessment. The only thing, the facts are he looked sleepy. Was he sleepy or was he high? We don't know. We asked the court to give him a drug test. The court refused. But a lot of this would come out in his demeanor and testimony. I mean, the coherence or lack of coherence of someone's testimony is on full display before the jury. Whether somebody is nodding off or drowsy or whatever, that's on full display before the jury. And it may have been to your advantage that he was sleeping rather than to your disadvantage because he would have made a far less credible witness. And the jury would say to themselves, we can't put any stock in what this person is saying. He's not fully awake. I mean, why didn't that work to your advantage? The district court apparently, after seeing all of that, opined that he was sleepy. One must infer from that that some of the jurors would have agreed with the government. When in fact, Your Honor, you asked about the weight of the evidence. We believe the drug test should have come in. If the government wanted to argue, and we told the district judge, let it come in. The government can argue that it should not be given any weight because it was taken after the fact. The very argument that is made when the defense tries to introduce stuff, we said, go ahead, let it in, let the jury. Why can't a district judge look at that and say, look, this whole business of Lloyd's prior drug habits, this is going to be a collateral mini-trial to go into a witness, every witness's past drug test. He said you could cross-examine Lloyd about his drug use, but. We just wanted to introduce the certified document that showed he had tested positive for drugs. Was there an authenticated document? Yes, that's all we wanted to introduce. Didn't the court say, though, that you, as your opponent says, that you could have subpoenaed the person who administered the test? Yeah, and the person who administered the test is someone who works at the jail who knows nothing about what it means. You know, pee into this bottle. That person could give us no, could not give us what the court wanted to be introduced. But again, that should have gone to the weight of the evidence. His testimony about whether he's testimony was he was clean, completely clean, but had done marijuana once three weeks ago. If that's the case, then it should not have. He tested both positive for opiates and marijuana, and it just should have gone in because as the district court made the rage, the conclusion that he was sleeping, and that's the government's argument. That's exactly why it should have come in. Costello was another primary witness, did not know my client. Thank you so much. Judge, I need to, one, if the court will allow me, because my client asked me to bring this out. Can you do so briefly? Yes, briefly. The government, the prosecutor, and I didn't make an argument over this, but the prosecutor made, the prosecutor called Mr. McIntosh. I asked a question of a government agent. The prosecutor, in open court, out loud in front of the jury said, the only person who can answer that question is your client if he wants to testify. I moved for a mistrial. It's an eight-week trial. I didn't think that the court was going to reverse the conviction on that point alone. But I just say that to give you a flavor of what was going on in that trial, and my client very much wanted me to bring this out, so I'm bringing it out. Um, Mr. McIntosh deserves a new trial, and I would ask the court to grant it. Thank you so much. Thank you, Your Honor. We'd like to, um, Ms. Hernandez, I see that you're court appointed. Yes, sir. And, um, the court would like to express its appreciation to you for the diligence and conviction with which you've presented your client's case. Thank you so much. Thank you, Judge.
judges: J. Harvie Wilkinson III, Albert Diaz, Stephanie D. Thacker